Filed 2/19/15  P. v. Williams CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>LASHON R. WILLIAMS,<br><br>  Defendant and Appellant. | 2d Crim. No. B247843<br>(Super. Ct. No. TA123426)<br>(Los Angeles County) |

Lashon R. Williams appeals after a jury convicted her of voluntary manslaughter (Pen. Code,[1] § 192, subd. (a)), and found true a personal deadly weapon use allegation (§ 12022, subd. (b)(1)).  The trial court sentenced her to 12 years in state prison.  Appellant raises claims of instructional and evidentiary error and prosecutorial misconduct.  She also  claims the court erred in denying her *Batson/Wheeler*[2] motion and sentencing her to the upper term.  We affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162.

## STATEMENT OF FACTS

### *Prosecution*

Triston Taylor and appellant were in a long-term relationship and had two children together. In June 2012, Taylor was not living with appellant but often visited the apartment where she lived with their children and her eight-year-old daughter Aniyah.

On the evening of June 2, 2012, Taylor called his friend Travis Dedeaux and said he had "busted [appellant] having an intimate conversation with her sister['s] baby daddy." Appellant was yelling and it sounded like she and Taylor were "tussling" over the phone. After the call was disconnected, Taylor called Dedeaux back and said, "[the] bitch just called 911 on me" and "want[s] me to hit her so I could go to jail." At Taylor's request, Dedeaux drove to appellant's apartment to pick him up. When Dedeaux arrived, Taylor was walking on the driveway and holding his chest. Taylor said, "call 911" and lay on the ground. As appellant was being taken to a police car in handcuffs, she lunged toward Taylor and yelled, "Get up n***er. I know you're faking it. Get up. Yes, I stabbed him."

Marc Walker heard the argument from his apartment next door. Walker later went outside, looked over the balcony, and saw Taylor "laying [*sic*] in the street bleeding." Appellant walked up the stairs holding a knife and placed it on the ledge at the top of the landing. She "was crying crocodile tears" and said, "I didn't mean to do this. I'm sorry. And I was tired of him beating on me."

Taylor died at the hospital. The cause of death was a stab wound to his heart and left lung. The coroner concluded significant force must have been used to inflict the wound.

Appellant was interviewed at the police station that night by Detective Melvin Hernandez and Officer Sam Marullo. She cried throughout the interview and at one point "fell on the floor." In addition to recounting the incident, she described several prior incidents of domestic violence involving Taylor. Detective Hernandez identified police reports for 12 such incidents, several of which included documentation of appellant's injuries.

2

Aniyah gave three accounts of the incident when she was interviewed five days later.  In the first account, appellant was talking on the phone when Taylor came in and said he had heard her downstairs.  Taylor grabbed the phone, asked the caller who he was, and told him to come over and fight.  When appellant asked if Taylor was serious, he hit or pushed her and threw the phone under the couch.  Appellant flipped the couch and retrieved the phone.  Aniyah began crying and Taylor told her to "shut the F up, and go to sleep."  Appellant said, "don't talk to my daughter that way" and told Aniyah, "stop crying because I'm about to call the cops."  Taylor replied, "if you call the cops, and they arrive here, I'm going to sock you right in front of them."  Appellant said, "Do it!"  Appellant threw a shoe and spoon at Taylor.  She then got a knife from a drawer in the kitchen and "cut" Taylor on the chest.

In the second account, appellant took Taylor's keys after he pushed her to the floor and said she would not give them back "until the police come."  Appellant "stabbed [Taylor] in the heart," but Aniyah did not know whether appellant did so "on accident" or "on purpose."  Appellant threw a shoe and spoon at Taylor after she stabbed him because she was angry about what he said to Aniyah.  In the third account, Taylor dropped the phone after he grabbed it from appellant and it "slid under the couch."  Appellant flipped the couch to retrieve the phone and called the police.  She called her mother after Taylor pushed her to the floor.  Taylor called appellant's mother "dirty" and she said, "Don't talk about my momma."  Taylor told Aniyah, "you need to shut the F up" and appellant said, "don't talk to my daughter that way."  Taylor "said it again," and appellant threw the shoe and spoon at him.  Appellant grabbed the knife and showed it to Taylor.  As he was "trying to do" something, she swung the knife and cut him.

Aniyah also recounted an incident when appellant stabbed Taylor in the shoulder as they were fighting with knives "like swords."  Appellant's ear and mouth were bleeding and there was blood on a fan.  As Taylor was about to drive away in his car, appellant threw the knife at him and it "fell in the street[.]"

Aniyah testified at trial that Taylor found appellant talking to Aniyah's "cousin's dad" on the telephone.  Taylor grabbed the phone from appellant and she tried

to retrieve it. Taylor pushed appellant and threw the phone under the couch. Appellant lifted the couch and Taylor yelled at her and pushed her. When asked for further details, Aniyah said did not want to talk about it and could not remember.

*Defense*

*Appellant's Testimony Regarding the Charged Offense*

Taylor came to appellant's apartment that morning and she took his car to run errands and get food. When she returned at about 1:00 p.m., she got a knife from a kitchen drawer and used it to cut up her daughter Tiara's food. She washed the knife and put it in the dish rack on the kitchen counter.

In the meantime, Taylor was drinking vodka he brought to the apartment. At about 2:20, appellant made drinks for Taylor and herself. They spent the afternoon watching movies while Taylor continued to drink.

Later that day, Taylor walked to a store to buy more alcohol. When he returned, appellant was talking on the phone with Maurice Hawkins, the father of her sister's daughter, about a birthday party for his daughter and Aniyah. Appellant heard Taylor yelling outside her front door and let him in. Taylor said he could hear appellant talking all the way down the street and wanted to know who it was. When she said it was Hawkins, he grabbed the phone and told Hawkins "to come over so he could knock his bitch ass out." Taylor told appellant he was "gonna fuck [her] up" for "being sneaky." He told Hawkins he was "about to handle this bitch" and threw the phone in the middle of the couch.

Appellant repeatedly asked Taylor to leave. Aniyah began crying and Taylor said "Bitch, shut the fuck up." Appellant told Taylor not to speak to Aniyah like that and tried to retrieve the phone. Taylor hit her in the head with a closed fist and she fell to the floor. She found an old cell phone and went to her room to call the police. Taylor followed her and tried to take the phone from her. He slapped her and she fell again.

Appellant called 911 while Taylor was on the phone with someone else. She did not always call the police when she and Taylor fought, but this time "he had a

4

different look."  The fight continued after the call was completed.  He pulled her hair and swung at her, and she swung back to defend herself.  Appellant retrieved the phone and called her mother, Daneene Hedgeman, who said she would be there to pick appellant up in a few minutes.

Appellant threw a shoe and spoon at Taylor as they continued fighting. Taylor ran at appellant while swinging at her.  She grabbed the knife from the dish rack to protect herself.  Taylor hit her on the back of the head, dragged her by her hair toward the door, and said, "Bitch, I'm going to kill you.  It ends today."  Appellant got away from Taylor and told him to leave.  He swung at her and grabbed her hair, and she swung the knife at him.  She did not intend to stab him and did not know she had done so until he said, "bitch, you just stabbed me."  When she saw him lying on the street, she thought he was pretending to be seriously hurt because he walked away and continued talking after she stabbed him.

*Prior Incidents of Domestic Violence*

Appellant and several defense witnesses testified to prior incidents of domestic violence between appellant and Taylor.  Appellant's friend Louisha Dorsey recounted a September 2008 incident in which Taylor tried to force appellant into his car. Taylor grabbed Dorsey's wrist when she intervened and called appellant a "whore," "prostitute," and "bitch" as she and Dorsey were walking away.

In January 2010, Taylor broke a window at appellant's residence.  When she opened the door, he hit her in the face and kicked her in the ribs as she fell to the floor.  Appellant called the police and Taylor was detained.  Appellant had a bloody lip but refused medical treatment.  Subsequent attempts by the police to contact appellant were unsuccessful.  During another incident in 2010, Taylor stabbed appellant in the knee with a knife.

In May 2011, when appellant was three months pregnant, Taylor hit her with a fan and cut her ear.  Appellant called the police but refused treatment.  In April 2012, Taylor threw appellant's cell phone at a television to prevent her from calling the police.  Taylor often looked at her phone to see if she had called anyone, and then would

5

break the phone. During another incident that same month, Taylor "stuck" appellant with a pair of tweezers.

In May 2012, appellant asked Taylor to leave her apartment and escorted him to the door. Taylor grabbed appellant, tilted her over the balcony, and said, "you see how easy it is for me to end your life?" Appellant called the police but did not make a report. During the summer of 2012, appellant called her friend Brittany Smith and asked if she could pick up appellant and her children at her apartment. When Smith arrived, appellant was bruised and had cuts on her arms and back. Taylor pulled his car behind Smith's to block her exit, but eventually allowed them to leave. Taylor choked appellant on two other occasions.

*Expert Testimony on Intimate Partner Battery*

Clinical psychologist Dr. Nancy Kaser-Boyd testified as an expert on intimate partner battery (IPB), formerly known as battered women's syndrome. IPB is a syndrome in which an individual subjected to violence from an intimate partner develops a reaction that may involve reciprocal violence. Dr. Kaser-Boyd evaluated appellant and read several reports regarding the present incident and seven prior incidents. The doctor concluded that appellant was suffering from IPB. Appellant has a negative view of herself and was disposed to feeling that each new event of abuse involved a threat of imminent danger. Appellant also believed there was nothing she could do to escape from Taylor. The doctor noted that appellant had reported to the police in April 2012 that Taylor made death threats against her and she was in fear of her life. The police log stated that appellant "does not wish to prosecute the suspect because she's in fear of her life and the life of her family."

*Rebuttal*

When appellant was interviewed on the night of the incident, she never mentioned that she feared for her life when she stabbed Taylor or that he had threatened to kill her. She discussed prior incidents of Taylor's domestic violence, but never said he had raped her, stabbed her, or caused her to suffer a miscarriage. She also said she had never gone to the hospital for treatment of injuries Taylor had inflicted on her. When

6

asked if he had ever used a weapon on her, she replied, "No, just his size and his fists." In recounting the present incident, appellant said Taylor slapped her once and "swung her by the hair" after she fell. When asked to identify the worst prior incident of abuse, appellant replied that Taylor had once "stomped on her" and threw a fan at her while she was pregnant with Tiare. Appellant said she "ended up in the hospital" as a result, but the police report of the incident states that she refused medical treatment.

Although appellant said Taylor had never used a weapon against her, she recounted an incident in which he threw a fan at her. She also said she went to the hospital after the incident when Taylor threw a fan at her and kicked her.

DISCUSSION

*Instructional Error*

*Mutual Combat (CALCRIM No. 3471)*

Appellant contends the court erred in giving CALCRIM No. 3471, the jury instruction regarding mutual combat.[3] We agree, but conclude the error is harmless.

It is well settled that "instructions *not* supported by substantial evidence should not be given. [Citation.] 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]' [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050 (*Ross*).)

The doctrine of mutual combat as provided in CALCRIM No. 3471 "applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Ross, supra*, 155 Cal.App.4th at p. 1036.) "[A]s used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or*

---

[3] The jury was instructed: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. She actually and in good faith tried to stop fighting; [¶] AND [¶] 2. She indicated . . . to her opponent, in a way that a reasonable person would understand, that she wanted to stop fighting and that she had stopped fighting; [¶] AND [¶] 3. She gave her opponent a chance to stop fighting. [¶] If the defendant meets these requirements, she then had a right to self-defense if the opponent continued to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

7

*agreement preceding the initiation of hostilities*." (*Id.* at p. 1045.) The instruction should not be given unless there is "evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id.* at p. 1047.)

Here, it is undisputed that Taylor initiated the "violent confrontation" that led to his death. The mere fact appellant responded to Taylor's assault, however, did not transform the confrontation into one of mutual combat. For mutual combat to apply the "common intention or desire [to fight] must precede the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target. If A triggers such a right in B by striking him, B does not forfeit that right merely because the blow makes him 'want to fight.' Hot blood may cause him to exercise the right unreasonably, and to that extent he will forfeit it. But his 'want[ing] to fight' does not make it a case of mutual combat." (*Ross, supra*, 155 Cal.App.4th at p. 1045, fn. 14.)

Although the instruction on mutual combat should not have been given here, the error is harmless. There is no merit in appellant's claim that the instruction violated her constitutional right to present a defense, such that the error is subject to the beyond-a-reasonable-doubt harmless error standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). "The trial court . . . did not 'fail[] to instruct' on a defense theory but gave an unwarranted . . . instruction on a *prosecution* theory in *rebuttal* of the defense." (*Ross, supra*, 155 Cal.App.4th at p. 1054.) Such errors are reviewed under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130 (*Guiton*).) Under this standard, we must affirm unless our review of the record affirmatively reflects a reasonable probability that the jury found appellant guilty based solely on the theory that she killed Taylor while the two were engaged in mutual combat. (*Id.* at p. 1130.)

The record reflects no such probability. The jury was advised under CALCRIM No. 200 that some of the instructions might not apply, depending on its findings about the facts of the case, and that the inclusion of a particular instruction did not mean the court was "suggesting anything about the facts." The jury was also

8

instructed to first determine what the facts were, then follow the instructions that applied to the facts as it found them. Nothing in the record undermines the presumption that the jury heeded this advisement and thus ignored the inapplicable instructions. (*People v. Holloway* (2004) 33 Cal.4th 96, 152–153 (*Holloway*); *Guiton, supra*, 4 Cal.4th at p. 1131.) In light of the evidence, it is also clear that no reasonable juror could have found that stabbing Taylor in the heart was an act of perfect self-defense. The erroneous giving of CALCRIM No. 3471 was thus harmless.

*Involuntary Manslaughter (CALCRIM No. 580)*

Appellant claims the court erred in failing to sua sponte instruct on involuntary manslaughter pursuant to CALCRIM No. 580.[4] She also asserts that her trial counsel's failure to request the instruction amounts to ineffective assistance.

The effective assistance of counsel is not implicated regardless of whether the instruction should have been given. The court had a sua sponte duty to instruct on involuntary manslaughter as a lesser offense of murder only if there was "'. . . "evidence from which a jury composed of reasonable [persons] could have concluded"' that the particular facts underlying the instruction did exist." (*People v. Wickersham* (1982) 32 Cal.3d 307, 324, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200-201 (*Barton*).) No such evidence was present here. A killing is involuntary manslaughter if it occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) A killing

---

**4** CALCRIM No. 580 provides in part: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] The defendant committed involuntary manslaughter if: [¶] 1 The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2 The defendant committed the (crime/ [or] act) with criminal negligence; [¶] AND [¶] 3 The defendant's acts caused the death of another person."

9

resulting from a noninherently dangerous felony committed without due caution and circumspection is also involuntary manslaughter. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.) The crime is *voluntary* manslaughter, however, if the defendant intends to kill or acts with a conscious disregard for life and the knowledge that her conduct endangers the life of another. (*People v. Blakeley* (2000) 23 Cal.4th 82, 85 (*Blakeley*).)

Appellant killed Taylor by stabbing him in the heart. Because the manner of killing reflects appellant acted with an intent to kill or with conscious disregard of the risk that her actions would result in Taylor's death, no instruction on involuntary manslaughter was required. (*Blakeley, supra*, 23 Cal.4th at p. 85.) Moreover, "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions. [Citations.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085-1086.) In convicting appellant of voluntary manslaughter, the jury necessarily found she acted either with an intent to kill or with a conscious disregard for life. Any error in failing to give CALCRIM No. 580 was thus harmless.

## Evidentiary Claims

### Taylor's Threats Against Dorsey

Appellant claims the court violated her constitutional right to present a defense by precluding her from asking defense witness Louisha Dorsey whether Taylor had ever threatened Dorsey. Anticipating our conclusion that the claim is forfeited due to the lack of a constitutional objection (*People v. Partida* (2005) 37 Cal.4th 428, 433-434), appellant asserts that counsel's failure to object amounts to ineffective assistance.

We are not persuaded. Even if appellant was entitled to present the evidence, "violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) In any event, the evidence was properly excluded. "While the character of the deceased is relevant on the issue of self-defense, generally it cannot be proved by specific acts of violence toward third parties. [Citations.]" (*People v. Davis* (1965) 63 Cal.2d 648, 656.) Although

10

*appellant's knowledge* that Taylor had made threats to third parties was relevant to her claim of self-defense (*People v. Spencer* (1996) 51 Cal.App.4th 1208, 1219), she offered no such evidence.[5]  She also fails to offer authority for her assertion that the evidence was admissible to bolster the expert testimony that she was suffering from the effects of IPB.  Even if she could demonstrate that the evidence should have been admitted for this purpose, the overwhelming evidence that she was guilty of no less than voluntary manslaughter would render the error harmless under both *Watson* and *Chapman*.

*Appellant's Police Interview*

Appellant contends the court erred in excluding the audiotape of her police interview.[6]  She asserts that the entire interview was admissible as a prior consistent statement under Evidence Code sections 791 and 1236.  She claims the interview was also admissible under the rule of completeness set forth in Evidence Code section 356.[7]

The latter claim was not raised below and is thus forfeited.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 653.)  Moreover, her claim that the entire interview was admissible as a prior consistent statement is without merit.  As appellant acknowledges, evidence of a witness's prior consistent statement is not admissible to rebut a charge that her trial testimony was fabricated unless "the statement was made before the . . . motive for fabrication . . . is alleged to have arisen."  (Evid. Code, § 791, subd. (b).)  Here, any motive for fabrication plainly preceded appellant's post-arrest interview.

---

[5] In her reply brief, appellant argues that the People are foreclosed from raising this point on appeal because they did not object to the evidence on this specific ground below.  The People, however, were not required to make appellant's case for her.  Once the People raised a relevancy objection, it became incumbent on appellant, as the proponent of the evidence, to demonstrate its relevancy.  The People are not now precluded from relying on appellant's failure to make the requisite showing.

[6] We granted appellant's motion to augment the record to include the transcript of the interview.

[7] Evidence Code section 356 provides:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

In any event, any inconsistencies between appellant's trial testimony and her interview statements were reconciled when Detective Hernandez testified on rebuttal. The parties plainly understood the audiotape would be admissible only "[i]f the detective says something different" than appellant said during the interview. Defense counsel went on to question the detective regarding every relevant detail of the interview, and thereby elicited the very statements she claims were erroneously excluded. To the extent appellant claims that her statements during the interview were also relevant to show her state of mind, that evidence was sufficiently offered through the testimony of Detective Hernandez and Officer Marullo. Appellant thus cannot be heard to complain that the audiotape of her interview should have been admitted.

*Character Evidence (Evid. Code, § 1102, subd. (b))*

Dorsey testified on direct examination that appellant was a "good person" and a "good friend" who was "always there for you." On cross-examination, the prosecutor was allowed to ask Dorsey if she knew appellant had been convicted of making terrorist threats (§ 422). Appellant claims this "inadmissible disposition" evidence should have been excluded. We are not persuaded.

Under Evidence Code section 1102, a criminal defendant may offer "evidence of [her] character or a trait of [her] character in the form of an opinion or evidence of [her] reputation" in order to demonstrate that her character is inconsistent with commission of the charged crime. (Subd. (a).) Thereafter, "the prosecution may cross-examine a defense character witness about acts inconsistent with the witness's testimony as long as the prosecution has a good faith belief that such acts actually occurred." (*People v. Kennedy* (2005) 36 Cal.4th 595, 634, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458–459; Evid. Code, § 1102, subd. (b).) Here, appellant elicited Dorsey's testimony that appellant was a "good person" who was "always there for you." The prosecution was thereafter entitled to ask Dorsey whether she had "heard" of past conduct that was inconsistent with Dorsey's opinion of appellant's good character. Because making criminal threats is a crime of moral turpitude (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424), appellant's conviction of that crime was

12

relevant to Dorsey's opinion of her character. Asking Dorsey if she had heard of the conviction was thus proper under subdivision (b) of Evidence Code section 1102.

Appellant complains that "the jury was left to speculate" as to the facts underlying the conviction because "the prosecutor did not include in her question to Dorsey that the conviction was a misdemeanor, and never addressed any of the facts during the course of trial, such as when appellant testified." Aside from failing to appreciate that she could have elicited this information on her own, appellant overlooks the fact that the jury was instructed to consider the prosecutor's question for a very limited purpose. The jury was told pursuant to CALCRIM No. 351 that "[t]he attorney for the People was allowed to ask defendant's character witness[es] if they had heard that the defendant had engaged in certain conduct. These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of a character witness's testimony." We presume the jury understood and heeded this instruction. (*Holloway, supra*, 33 Cal.4th at pp. 152–153.)

Moreover, Dorsey testified that the conviction did not change her opinion that appellant was a person of good character. No reasonable juror would have interpreted the prosecutor's question and/or Dorsey's answer thereto as having any meaningful bearing on the determination of appellant's guilt. That the jury did not do so is reflected in its acquittal on the charged offense of murder. In light of the overwhelming evidence that appellant intentionally killed Taylor either in the heat of passion or in imperfect self-defense, any error in allowing the prosecutor to ask Dorsey about appellant's prior conviction was harmless under both *Watson* and *Chapman*.

### *Prosecutorial Misconduct*

Appellant contends the prosecutor committed prejudicial misconduct by falsely representing to the jury that appellant had been convicted of prostitution. This claim is forfeited and in any event fails.

Shortly after characterizing appellant as a "good person" and a "good friend," Dorsey recounted that Taylor had threatened appellant and "called her a whore, a

13

prostitute, a bitch." On cross-examination, the prosecutor asked, "isn't it true that [appellant] was a prostitute?" Appellant objected. At sidebar, the prosecutor stated that appellant had been convicted of prostitution and appellant's attorney interjected, "I believe it's a misdemeanor conviction . . . ." The prosecutor argued that Dorsey could be confronted with this information because "she's calling those threats, and they're not threats." The prosecutor further argued that the question was admissible to impeach Dorsey's testimony that she and appellant were "good friends." Appellant's attorney did not dispute this or otherwise state any further objection to the prosecutor's line of questioning. After the court overruled the objection, the prosecutor asked Dorsey if it would "surprise [her] to know that" appellant had been convicted of prostitution "between the time when you said that you guys were living together[.]" Dorsey responded she would be "shocked" to discover this. On redirect, Dorsey testified that this information did not change her opinion that appellant was afraid of Taylor "[b]ecause that has nothing to do with it."

For the first time on appeal, appellant claims the prosecutor lied to the court about appellant's prostitution conviction. As proof, she offers that the probation report prepared in anticipation of sentencing does not refer to a prostitution conviction, yet merely reflects a conviction under a section of the Los Angeles Municipal Code that makes escorting without a license punishable as an infraction.

Appellant's claim of prosecutorial misconduct is forfeited because trial counsel did not timely object or seek a curative instruction. (*People v. Hinton* (2006) 37 Cal.4th 839, 863.)**8** In any event, the claim fails on the merits. As the People correctly note, the lack of any reference to a prostitution conviction in the probation report does not

_____

**8** In her reply brief, appellant contends that trial counsel provided ineffective assistance by failing to object. Because this claim is raised for the first time in the reply brief, it is forfeited. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) In any event, it is not reasonably probable appellant would have achieved a more favorable result had counsel objected. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) Appellant has also raised her claims of prosecutorial misconduct and ineffective assistance of counsel in a habeas petition (B260296), along with a claim that trial counsel provided ineffective assistance by requesting CALCRIM No. 3475 [right to eject trespasser from real property]. We summarily deny the petition in a separate order filed concurrently with this opinion.

14

conclusively prove appellant never suffered such a conviction. Even if it did, there is no evidence the prosecutor intentionally misrepresented otherwise; indeed, defense counsel also stated her belief that appellant had been convicted of prostitution.

Even assuming that the prosecutor's representation was misconduct, there is no basis for reversal. Appellant claims the error is subject to the beyond-a-reasonable-doubt standard of review set forth in *Chapman* because it involves "[t]he admission of false testimony" and "the use of false evidence." (See *Campbell v. Superior Court* (2008) 159 Cal.App.4th 635, 652.) But the prosecutor's questions were neither "testimony" nor "evidence," at least not in the manner appellant contemplates. At her request, the prosecutor's questions were allowed for the limited purpose of challenging Dorsey's opinion that appellant was a person of good character and was legitimately afraid of Taylor. As we have noted, we presume the jury heeded the instruction that it consider the question and answer regarding appellant's conviction for the limited purpose of "evaluat[ing] the meaning and importance of" Dorsey's testimony that appellant was a person of good character. (*Holloway, supra*, 33 Cal.4th at pp. 152–153.) Moreover, the overwhelming evidence of appellant's guilt renders any error harmless under any standard of review.

### *Batson/Wheeler*

Appellant, who is African-American, claims the court erred in denying her *Batson/Wheeler* motion based on the prosecution's excusal of three prospective female jurors who are also African-American. We disagree.

The federal and state Constitutions prohibit the use of peremptory challenges to exclude prospective jurors due to their race. (*Batson, supra*, 476 U.S. at p. 97; *Wheeler, supra*, 22 Cal.3d at pp. 276-277.) A defendant claiming that jurors have been excluded on this ground must first "'. . . ". . . make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-

15

neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" [Citation.]' [Citations.]" (*People v. Battle* (2011) 198 Cal.App.4th 50, 59 (*Battle*).)

When the trial court denies a *Batson/Wheeler* motion on the ground that no prima facie case was made, we consider the record of the voir dire with "considerable deference" to determine whether the evidence supports the court's ruling. (*Battle, supra*, 198 Cal.App.4th at p. 60.) Under this standard, we will affirm if the record suggests grounds upon which the prosecutor might have reasonably challenged the juror or jurors in question. (*Ibid.*) Even when no prima facie case has been established, the prosecutor's proffered reasons may demonstrate a legitimate, race-neutral reason for having so acted. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 723-724.)

Appellant's motion alleged the prosecutor had excused prospective Jurors Nos. 2703 and 2636 based on the fact they were African-American females. The court responded, "I'm looking at my notes. It looks like the first peremptory by the People was on a male Black. Then we had a male Latin. And then we had a female Latin, and then a female Black, a male Latin, female Black, female Latin, female Black. . . . [A]nd I didn't get a good look, but there are at least two other . . . African-Americans that are still in the box. I don't find that there has been a prima facie case made."

The court then told the prosecutor that although she was not required to do so she could "state something for the record." The prosecutor asked appellant's attorney whether the motion included the male African-American prospective juror who had been excused. Counsel replied that it was directed at "[t]he female Blacks in particular, given the fact that the defendant in the case is female Black."

The prosecutor noted she had actually excused three African-American females. Prospective Juror No. 5330 was excused because she was a law student. The prosecutor explained: "I thought that when she got back there [to deliberations], she would basically try and teach the law. I know the court asked her about that, but, again, I think being that I've been to law school and I've dealt with other law students, I was not going to take the chance having her on my jury."

16

As to prospective Juror No. 2703, the prosecutor offered: "[Y]esterday she came in a black hooded sweatshirt to court, and today she did. I noticed it as soon as I walked in. Also one of the reasons why juror number 1435 was kicked was because he was also wearing a hooded sweatshirt into court. I don't think that's appropriate dress for court. Looking at everyone else in the jury, they all have a different style of dress on, and that's something that I do consider in my jurors. So for that reason alone I think that she was not going to be appropriate and fit in with the other jurors in this case." Prospective Juror No. 2636 was excused because "she was a retired mental health case worker. Given the fact that the defense in this case is going to be somewhat of a mental health defense, it's P.T.S.D. — she says she was an addict as well, I feel that she might be sympathetic to the defendant. I asked her about it, again, her answers were neutral. But I don't want to chance given the case that I have and the peremptories I have to use, I was not going to take that chance on this jury."

Considering the record with "considerable deference" (*Battle, supra*, 198 Cal. App.4th at p. 60), we conclude the evidence supports the finding that appellant failed to make a prima facie case of purposeful discrimination. We reject appellant's claim that this finding was rendered moot when the prosecutor accepted the court's invitation to state her race-neutral reasons for the dismissals. Although this would be so if the court had gone on to find that the prosecutor's proffered reasons were legitimate (*People v. Banks* (2014) 59 Cal.4th 1113, 1146), that did not happen here. "[W]hen, as here, the trial court states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for purposes of completing the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied. [Citation.] When the trial court under these circumstances rules that no prima facie case has been made, 'the reviewing court considers the entire record of voir dire. [Citation.] "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question,"' we reject the challenge. [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 746 (*Welch*).)

17

The record of the voir dire supports the court's finding.  Although three of the first eight peremptory challenges involved female African-Americans, at least two African-Americans were "still in the box" when the motion was brought.  After the jury was empaneled, the court noted that four of the 12 seated jurors "appear to be females of African American de[s]cent."  These facts weigh in favor of the court's finding.  (*Welch, supra*, 20 Cal.4th at p. 746.)

The prosecutor's stated reasons for dismissing the challenged prospective jurors lends further support to the court's determination that appellant failed to establish a prima facie case of purposeful discrimination.  We reject appellant's claim that the court was required to conduct further inquiry into whether appellant had made this showing.  "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings."  (*People v. Silva* (2001) 25 Cal.4th 345, 386.)  "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine."  (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

A prosecutor's explanation for excusing a juror need not rise to the level of a challenge for cause.  (*Batson, supra*, 476 U.S. at p. 97; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122.)  A juror may be excused even on a hunch.  (*Gutierrez*, at p. 1122.)  Even a trivial reason that is genuine and group-neutral will suffice.  (*People v. Arias* (1996) 13 Cal.4th 92, 136.)  That standard was met here.  The prosecutor's stated reasons for excusing all three prospective jurors were both plausible and factually supported.  Contrary to appellant's assertion, it is essentially of no moment that the excused prospective jurors all said they would not be biased in favor of or against either party.

Appellant contends the proffered reason for excusing prospective Juror No. 2703 "should be considered 'code' for stating that [the prospective juror] is a [B]lack female from a [B]lack neighborhood."  She offers that "wearing a hoodie has not only become associated with commission of crimes, frequently by minorities, but also a symbol of the struggle for racial neutrality" and "has become symbolic of the dissonance

18

has [*sic*] highlighted by the Trayvon Martin case, as well as the garb worn at the Million Hoodie Marches nationwide."

Whatever symbolism a "hoodie" might have in another context, it falls into the broad category of clothing considered inappropriate for court. Manner of dress can be a race-neutral reason for a peremptory challenge. (See, e.g., *People v. Johnson* (1989) 47 Cal.3d 1194, 1218; *People v. Walker* (1988) 47 Cal.3d 605, 625.) Moreover, no age or racial group has an exclusive monopoly on hooded sweatshirts. Indeed, another prospective juror who is neither African-American nor female was also excused for wearing a hooded sweatshirt. This supports a finding that the prosecutor's reliance on the prospective juror's clothing was not a pretext for discrimination. Because the record need only "suggest[] grounds upon which the prosecutor might reasonably have challenged" prospective Juror No. 2703, and the juror's clothing provides such grounds, we must reject appellant's *Batson/Wheeler* challenge. (*Welch, supra*, 20 Cal.4th at p. 746.)

*Upper-Term Sentencing*

Appellant contends the court erred in sentencing her to the upper term. She claims that the court's findings in aggravation are not supported by the record, and that the court failed to consider relevant mitigating factors.

Appellant did not challenge the court's findings below, so her claim is forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 356.) Contrary to appellant's assertion, the fact that she argued in favor of a lesser term is not sufficient; indeed, the defendant in *Scott* also urged the court to impose a lesser term. (*Id.* at p. 339.) As *Scott* makes clear, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.) That is precisely what appellant seeks to do here.

In any event, the claim fails. "'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in "qualitative as well as quantitative terms" [citation] . . . . We must affirm unless there is a clear showing the sentence choice was arbitrary or irrational.' [Citations.]" (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) Unless the record

19

affirmatively reflects otherwise, we must also presume that the court considered all relevant factors in making its discretionary sentencing choice. (*People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637.) Appellant does not demonstrate that the court failed to consider all of the relevant factors, but rather merely takes issue with the manner in which the court evaluated those factors. For example, the court did not fail to consider the factors relating to the parties' history of domestic abuse, yet found they were neither mitigating nor aggravating given that "they were both victims of each other's violence during th[e] relationship." The evidence supports this finding.[9]

Appellant's arguments regarding the court's discussion of aggravating factors are similarly unavailing. Contrary to appellant's claim, the court expressly declined to treat appellant's criminal history as an aggravating factor. Rather, the court found as an aggravating factor that appellant showed a lack of remorse at the scene of the crime. Appellant cites authority for the proposition that a lack of remorse cannot be treated as an aggravating factor for purposes of sentencing if the defendant maintained her innocence following a conviction and the evidence of guilt is conflicting. (See, e.g., *People v. Key* (1984) 153 Cal.App.3d 888, 900.)

Here, the court's finding that appellant showed a lack of remorse relates to the evidence of her behavior at the scene of the crime. As Taylor was lying on the ground with a stab wound to his heart, appellant lunged at him and yelled, "Get up n***er. I know you're faking it. Get up. Yes, I stabbed him." The court found this to be "totally cold, callous, for lack of a stronger term, and to this court strong evidence of a lack of remorse." The court thus properly treated it as an aggravating factor. (Cal. Rules of Court, rule 4.421(a)(1) [aggravating factors relating to crime include that "[t]he crime

---

[9] Appellant claims the court's finding that "the self-defense issue" was not a mitigating factor is based on its erroneous belief that "[o]ne of the elements of voluntary manslaughter for which she's been convicted . . . is an intent to kill, which is imperfect self-defense or done with provocation . . . ." She notes that one who kills with conscious disregard for the victim's life can be convicted of voluntary manslaughter. (See *Blakeley, supra,* 23 Cal.4th at pp. 88-91.) This does not mean, however, that a voluntary manslaughter conviction cannot be premised on a finding of intent to kill. (See, e.g., *Barton, supra,* 12 Cal.4th at p. 199.) In light of the evidence, the court could infer that appellant's conviction entailed such a finding.

20

involved . . . acts disclosing a high degree of cruelty, viciousness, or callousness"]; compare *People v. Collins* (2010) 49 Cal.4th 175, 227 ["Conduct or statements demonstrating a lack of remorse made at the scene of the crime or which fleeing from it may be considered in aggravation as a circumstance of the murder under section 190.3, factor (a)"].)  This single aggravating factor is sufficient to justify the court's imposition of the upper term.  (*People v. Osband* (1996) 13 Cal.4th 622, 728-729.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Arthur M. Lew, Judge

Superior Court County of Los Angeles

_____

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.