[No. A070506. First Dist., Div. Four. Dec. 23, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE SPENCER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.B.

**COUNSEL**

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General,

Catherine A. Rivlin and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REARDON, J.**—A jury convicted appellant Andre Spencer of voluntary manslaughter and attempted voluntary manslaughter and found true enhancements of personal use of a firearm and infliction of great bodily injury. (See Pen. Code,[1] § 192, subd. (a); former §§ 664, 12022.5, subd. (a), 12022.7.) He was sentenced to 18 years and 4 months in state prison. Spencer appeals, contending that the trial court committed instructional and sentencing error.

## I. FACTS

### A. Facts of the Crime

On the night of June 12, 1991, appellant Andre Spencer shot and killed his cousin Anthony Jefferson and injured his cousin's girlfriend Cher Brooks. Jefferson and Brooks were driving around San Francisco paging Spencer. When Spencer responded, Jefferson talked with him on the cellular phone in Jefferson's car. They agreed to meet near Second and Townsend Streets. Jefferson had an open bottle of beer nestled between his legs. They spotted Spencer nearby and drove up to meet him.

Spencer came up to the two-door Mustang and Jefferson pulled over to let him get in. Spencer went into an alley first to get something off the top of a dumpster, returning with it hidden under his coat. He came over to the passenger side of the car. Brooks, who sat in the passenger seat, opened her door and leaned forward with her seat to allow Spencer into the back seat. She did not suspect that anything was amiss—" '[I]t's Andre and he's a friend.' " Instead of getting in the car, Spencer took a gun out of his jacket, said " 'check this out,' " and began shooting into the car. The first shot misfired. Then, Jefferson was shot four times and Brooks twice.

Spencer grabbed the injured Brooks and pulled her out of the car. " 'Come with me,' " Spencer said to Brooks. " 'I swear I won't kill you.' " She did not believe him and struggled to get free. He hit her head repeatedly with the gun. A police car pulled up, Spencer let go of Brooks, and ran. Police pursued Spencer briefly and arrested him. Spencer was unarmed at the time of his arrest.

[1] All statutory references are to the Penal Code unless otherwise indicated.

Jefferson died from his wounds—one gunshot to the back of his head and three in his back and shoulders. The bullet paths of all the wounds went back to front, from Jefferson's right to his left and slightly downward. Two of the bullets entered his heart and lungs, likely causing him to lose consciousness very quickly after he was shot. He had evidence of alcohol and cocaine in his system at the time of death.

Brooks survived the shooting, but was injured—one bullet destroyed her ear canal and the other hit her shoulder blade. She also suffered head lacerations and contusions causing a great deal of bleeding and requiring several stitches. Either of these injuries could have been lethal.

Spencer threw the gun onto a nearby rooftop before he was arrested; police retrieved a handgun with the handle missing from the roof later. The gun had blood on it. Police also found the handle of a gun on the sidewalk near Jefferson's car. They found a second firearm—a .380-caliber semiautomatic—10 to 12 inches beneath the passenger seat. The safety was on and the magazine contained four live rounds. Because of the rise in the floorboard between the driver's seat and passenger seat, it was unlikely that the weapon slipped from under the driver's seat.

## B. *Pretrial History*

Spencer was charged by information with the murder of Jefferson enhanced by the alleged use of a firearm. He was also charged with the attempted murder and assault with a deadly weapon of Brooks, each offense enhanced by allegations both of use of a firearm and infliction of great bodily injury. (See §§ 187, 245, subd. (a)(1); former §§ 664 [now 664, subd. (a); as amended by Stats. 1986, ch. 519, § 2, p. 1859], 12022.5, subd. (a) [as amended by Stats. 1990, ch. 41, § 3, pp. 245-247] , 12022.7 [as amended by Stats. 1979, ch. 145, § 17, p. 341].) In September 1992, the assault with a deadly weapon charge and its attendant enhancement allegations were dismissed on the prosecution's motion.

In Spencer's first trial, the jury deadlocked and in October 1992, the trial court declared a mistrial. Spencer persuaded the trial court to dismiss the murder charge on his motion to enter a plea of once in jeopardy, but that ruling was overturned on petitions to this court in March 1994. (*Spencer* v. *Superior Court* (Mar. 14, 1994) A063235 [nonpub. opn.]; *People* v. *Superior Court (Spencer)* (Mar. 14, 1994) A063463 [nonpub. opn.].)

## C. *Spencer's State of Mind*

During his second trial in February and March 1995, Spencer testified in his own defense, arguing that he acted in self-defense. His motion to admit

evidence of Jefferson's violent character was again granted. Evidence that Spencer knew of or had witnessed Jefferson's violence was admitted for the purpose of determining Spencer's state of mind.

Spencer told the jury that he and Jefferson had been close since they were children and that they had once shared an apartment, but that Jefferson became demanding and threatened him shortly before the shooting. He worked as a pager salesman. Jefferson got pagers from him to give to his friends. Once, Jefferson called and asked Spencer to turn off his pager. Jefferson explained that he had been involved in two attempts to kill Armon Price. Jefferson's pager was found at the scene and he did not want police to trace it back to him. The next day, Spencer told his employer that the pager had been lost and it was shut off. Jefferson also told Spencer once that he had been involved in a drive-by shooting after Brooks got into an argument with someone. Another time, Jefferson spotted someone who owed him money. Spencer watched Jefferson smash a window in the man's truck as he started to drive away. On other occasions, Spencer overheard Jefferson threaten people who owed him money to either pay him back or "I'll get you . . . ." Jefferson never seriously threatened Spencer. Spencer did not feel that Jefferson would ever harm him—he believed that he was "immune."

Spencer testified that his relationship with Jefferson deteriorated in the weeks before the shooting. In May 1991, Spencer told Jefferson that his pager account was unpaid and that the pagers were going to be turned off if he did not pay off his account. Jefferson told him to find the friends that he gave the pagers to and collect from them. Spencer declined; collecting money to pay off the account was not his responsibility. In early June 1991, the pagers were shut off. Jefferson called the next day—about a week before the shooting—and Spencer found out how much money was owed on the pager account. When Spencer gave Jefferson the information, Jefferson started screaming at him that the bill was too high and that Spencer should turn the pagers back on again. Jefferson accused Spencer of playing games with him and that Spencer should not "fuck" with him, that Jefferson was "the last person that [Spencer] should fuck with." Spencer yelled back that he did not work for that pager company anymore and had no voice in their practices. Jefferson told him to "either turn the pagers on or I'll peel your cap" and then hung up. Spencer understood Jefferson to have threatened to either beat him up or shoot him.

The next day, Jefferson called Spencer at work. He wanted to know why some of his pagers were off and some were on. Spencer explained that those issued by his former employer had been turned off, but the ones leased from his current paging company were still usable. Jefferson again asked Spencer

to call his former paging company to inquire about the pagers that had been turned off. Again, Spencer told him that the matter was out of his hands. He advised Jefferson to go to the paging company and pay his outstanding balance. Jefferson accused Spencer of lying, cheating, pocketing his money and playing games with him.[2] He called Spencer a "punk." Spencer told Jefferson that he was the punk, that he was too stupid to realize what Spencer was trying to tell him, but this only made Jefferson more angry.

That evening, Jefferson called again to ask for a pager. Spencer told him to either come to his office or meet at his home and he would give Jefferson one. The following day, Jefferson called again with the same request and Spencer made him the same offer. Jefferson asked Spencer to bring a pager to his Oakland home; Spencer agreed. These conversations were calmer, not as hostile as the earlier calls.

Spencer delivered the promised pager and a contract for its use to Jefferson that afternoon. Jefferson asked about the outstanding pager account and Spencer pulled out a copy of the account that he had obtained from his former employer and went over it with Jefferson. Jefferson also wanted to buy 10 pagers from Spencer under Brooks's name. Spencer told him that he would have to check with his supervisor. The supervisor was initially reluctant, but agreed to sell the pagers to Jefferson under certain conditions. Spencer went over the conditions with Jefferson, who accused him of lying and playing games with him. The next day—a couple days before the shooting, Jefferson called at work and Spencer went over the cost with him. Jefferson was angry about that, too, yelling at Spencer and saying he was trying to cheat him out of his money. Jefferson told Spencer that this was the last time he was going to let Spencer play games with him. He would "fuck" Spencer up if he kept playing games with him. Finally, he told Spencer to either turn the old pagers back on or he would send his soldiers out to take care of Spencer. Spencer told Jefferson that if he wanted to lower the cost, he could send each of his friends in to purchase the pagers individually. A third person on the line accused Spencer of trying to get Jefferson's friends to come in so that the paging company would get their names for the police. Spencer said that that was stupid, that he didn't care what the friends' names were as long as the bills were paid. Jefferson interrupted, saying Spencer had a smart mouth and that he was going to take care of Spencer himself. Jefferson hung up, then called back a few minutes later. He was through with Spencer, he said. Jefferson demanded that Spencer return a .22-caliber handgun that he had loaned to his cousin. Spencer told Jefferson to come and get it; Jefferson told Spencer to give the gun to his brother. Jefferson also told Spencer to move out of their grandmother's house.

---

[2]Spencer specifically denied that Jefferson paid him for the pagers and that he had pocketed the money instead of paying off his account.

The next day, Jefferson paged Spencer, but he ignored the calls. He was busy; he didn't feel like arguing. He saw Jefferson that evening near the home of Jefferson's mother. Jefferson again asked for his gun back. Spencer agreed to give it to Jefferson's brother that night. He retrieved the gun from his grandmother's house and went to give it to Jefferson's brother, but he was not home. Spencer did not want to leave the gun where Jefferson's mother would find it, so he put the gun in a paper bag and placed the bag in the back of his car.

The next day, Jefferson paged Spencer again repeatedly and Spencer would not respond to the calls. Jefferson called Spencer at their grandmother's house and asked again for 10 pagers. Spencer told him that the matter was out of his hands. Jefferson called him a "little bitch" and accused him of playing games. He threatened to "fuck" Spencer up. "Either turn the . . . pagers on or I am going to send the soldiers out. We are going to have to take care of you." Spencer told him that he could not turn the pagers on and to send out his soldiers if he was going to do so. He told Jefferson "fuck you" and hung up.

Spencer did not really believe that Jefferson was serious about his threats. He thought Jefferson was trying to intimidate him into doing what he wanted him to do. Spencer was angry about being accused of cheating him. Although Jefferson paged him several more times, they did not speak again until the afternoon of June 12. Jefferson asked him to give $2,600 to a family member whose car had been towed. Spencer refused—he was moving out of his grandmother's house and he did not have the money. Jefferson yelled at him, calling him a selfish punk who refused to help his family.

Spencer spent the day packing up his things for his move. He took his cousin to retrieve the towed car—the cousin had gotten the money he needed from someone else—and Jefferson began paging him again. Spencer called him from a pay phone; Jefferson wanted the pagers. Spencer agreed to meet him in Diamond Heights to go over the contract, but Jefferson never showed up. Jefferson paged him again; Spencer ignored it. He went to his boss's house to watch a basketball game.

After the game, Spencer drove around San Francisco and saw that Jefferson had paged him several more times. He called Jefferson's cellular phone number. Jefferson wanted to meet—he would pay for the 10 pagers. He was on the Bay Bridge headed for San Francisco; Spencer was on Harrison Street and they agreed to meet at Second and Townsend Streets. Spencer went to the agreed location and parked his car to wait for Jefferson. He waited about an hour, but Jefferson did not show up. Just as he started to drive away,

Jefferson paged him again. He parked at Third and King near a phone booth. He called Jefferson, told him where he was. Jefferson said that he was on his way.

Spencer returned to his car to wait for Jefferson to arrive. A brown Bronco pulled up beside him and its occupants looked into Spencer's car. The passenger was on a cellular phone. The Bronco drove on, made a U-turn and headed back in his direction. The lights on the Bronco went off, but it kept coming toward him. Spencer got out of his car, leaving his keys in the ignition. The Bronco accelerated. Spencer ran across the street and into an alley. He believed that the occupants of the Bronco were coming after him. Twice in the five minutes that he hid in the alley, Spencer saw the Bronco pass by the alley, once on each end. The Bronco was going real slow and its occupants were looking around.

Spencer started walking out of the alley to go back to his car and spotted Jefferson and Brooks. He asked Jefferson if he had seen a brown Bronco; Jefferson said no and told him to get in the car. Spencer explained that he had left his keys in the ignition of his car and wanted to retrieve them. At the car, Spencer got his keys and a contract for Jefferson. He remembered that he had Jefferson's gun, so he brought it along to return to his cousin. He put the gun in his waistband. As he locked his car, he saw Jefferson looking in the trunk of his own car for something.

Spencer walked back to Jefferson's car. Just as he got to the car, Jefferson pulled away from him. Spencer was puzzled and nervous, but walked toward Jefferson's car again. Jefferson was using his cellular phone. Spencer approached the driver's side of the car and started to pull it open, but Jefferson drove ahead again. Spencer was getting angry. He walked up to the car once more and stood at the driver's side. Jefferson gestured for him to go around to the passenger side. Spencer went around the back of the car and Brooks opened the door for him to get inside.

As Spencer put one foot in the car, he felt Jefferson's gun pinching his waist. He pulled the gun out of his waistband and continued getting into the car. Then, he saw the brown Bronco come around the corner and park. He was in fear of being in the street with the Bronco after him. He looked over at Jefferson to point it out to him, but Jefferson was staring straight at the Bronco, not looking at Spencer. Then, Jefferson started screaming at him. " 'I told you not to fuck me over. I told you not to play with me. I told you I was going to catch you slipping, and now I got something for you,' " Jefferson screamed. When Spencer saw Jefferson reach down to the floor-board of the car, he believed that Jefferson was pulling out a gun, although

he never actually saw a gun. Then, he became frightened of Jefferson. Spencer panicked and started shooting.

The first time Spencer pulled the trigger, nothing happened. He did not recall pulling the trigger after that, but he remembered the flash of the gun. Even after the flash, Jefferson continued to scream at him. He did not recall shooting Jefferson or Brooks.

Spencer had one foot in the car and one foot out of it. When the gun fired, he felt like he was being pushed. He turned to get out of the car, his foot got caught in the seat belt and he fell outside the car. He hit his head and smashed the gun. Part of the gun fell away.

When Spencer looked back in the car, he saw Brooks reaching under the driver's seat. She grabbed something, then tossed it aside as if it was not what she was looking for. Spencer thought she was looking for Jefferson's gun under the seat. He told Brooks to stop, but she ignored him. Spencer pulled her out of the car. She was struggling and he hit her twice with his hand to get her to stop. She grabbed for the gun and asked him not to kill her. He told Brooks he was not going to kill her, that he just wanted her to get away from the car. He pulled her toward his car to keep her from getting to Jefferson's gun. He also thought that if Jefferson or the men in the Bronco came after him, he would be safer if Brooks was with him. To show her that he did not intend to kill her, Spencer threw his gun away. Brooks had blood running down her face.

Spencer saw the Bronco again. He asked Brooks about the men in the Bronco, about what they were trying to do. Brooks said, " 'I didn't know what they were going to do. I didn't talk to them. I didn't know what was happening with them.' " Then, the police arrived. Spencer denied running from police.

Armon Price testified that Jefferson had threatened him several times. Once, on Halloween 1990, two or three men approached him. One wore a mask. One held a gun. One of the men held Price in a choke hold, trying to go through his pockets. Later, a car matching the description of Jefferson's Mustang was towed from the scene. On cross-examination, it came out that Price had earlier testified that Jefferson was not one of the men who attempted to rob him.

D.  *Other Trial Evidence*

An expert testified that the trajectory of the bullets in Brooks's body was consistent with the defense theory that she was leaning forward to get a gun

under her seat at the time that she was shot. The jury also heard evidence of Jefferson's arrest record and that Jefferson had spent time in a juvenile camp as a young man.

Jefferson's body was found sitting in his car with a bottle of beer nestled between his legs. The jury heard testimony suggesting that if he had reached under his seat for a weapon, the bottle of beer would have spilled. Brooks testified that things seemed fine until Spencer started firing; then, he was "acting crazy." During their struggle, Spencer was "rambling" about how someone told him that Jefferson "was going to get him." She did not know that Jefferson had a gun under the seat of his car—she had never seen him with a gun. Spencer testified that he had seen Jefferson with a gun on several occasions. Brooks denied grabbing anything under the driver's seat of the car.

Spencer also called as a defense witness an aunt of his and Jefferson's, who testified that the day after the shooting, she spoke with Brooks in the presence of Jefferson's mother. She said that Brooks told her that while they were waiting for Spencer, Jefferson told Brooks something about "teaching Andre a lesson"—that he was going to " 'kick his butt' " or " 'kick his ass . . . .' " Brooks recalled seeing a brown Bronco that night, she told the aunt.

On rebuttal, Brooks denied that she spoke with them about a brown Bronco. She denied ever seeing a brown Bronco. Jefferson's mother also testified that she was present during the meeting with the aunt and denied that Brooks told both of them about a brown Bronco. The grandmother of both Spencer and Jefferson testified that Jefferson's aunt was not a truthful person, but that Jefferson's mother was more honest.

E. *Deliberations, Verdict and Sentence*

The jury was instructed on both self-defense and imperfect self-defense— the actual but unreasonable belief in the need to defend. The jury found Spencer guilty of voluntary manslaughter, enhanced by personal use of a firearm, and attempted voluntary manslaughter, enhanced by both personal use of a firearm and infliction of great bodily injury. He was acquitted of murder and attempted murder charges. (See §§ 192, subd. (a); former §§ 664 [now 664, subd. (a)], 12022.5, subd. (a), 12022.7.) Spencer was sentenced to a total term of 18 years and 4 months in state prison. He was sentenced to an upper term of eleven years for voluntary manslaughter, with a five-year upper term enhancement for firearm use, and a midterm of one year for attempted voluntary manslaughter enhanced by one year and four months for

firearm use. The great bodily injury enhancement was stayed. (See § 1170.1; former § 12022.7.)

## II. INSTRUCTIONS

First, Spencer contends that the trial court erred by refusing to instruct the jury that it could consider his knowledge of Jefferson's prior threats and acts of physical violence perpetrated against third parties when determining whether he reasonably believed that he was in imminent danger at the time of the shooting. He contends that the trial court thus prejudicially violated his state and federal constitutional right to due process. (See U.S. Const., Amend. XIV; Cal. Const., art. I, §§ 7, subd. (a), 15.)

The record reflects that the trial court allowed the defense to present evidence not only of Jefferson's threats against Spencer but of Jefferson's threats and acts of violence against third persons that were known to Spencer. (See *People* v. *Davis* (1965) 63 Cal.2d 648, 656-657 [47 Cal.Rptr. 801, 408 P.2d 129].) At the time this evidence was admitted, the jury was repeatedly admonished that it was being received as relevant to Spencer's "state of mind," i.e., his fear of and appreciation for Jefferson's violent character. In its instructions to the jury at the conclusion of the case, the trial court gave the standard instructions on self-defense. (CALJIC Nos. 5.12, 5.14, 5.15, 5.50, 5.51, 5.52.) To the standard instructions, the trial court added the following language: "As used in these instructions, [']imminent danger['] means that the danger must have existed or appeared to the defendant to have existed at the very time the fatal shot was fired. In other words, the danger must appear to the defendant as immediate and present[,] and not prospective or even in the near future. An imminent danger is one that[,] from appearances, must be immediately dealt with. In determining whether a person presents an imminent danger, the defendant is entitled to consider *all the circumstances, including* any prior assaults or threats by that person against the defendant. [¶] One who has received threats against his or her life or person is justified in acting more quickly and taking harsher measures for his or her own protection in the event of assault, either actual or threatened, [than] would be a person who had not received such threats. [¶] If in this case you find that the evidence shows that the deceased, Tony Jefferson, made prior threats against the life or person of defendant, and [that] the defendant as a result thereof had reasonable cause to fear greater peril from an altercation with the deceased than he otherwise would have, you are to take such factors and circumstances into consideration in determining whether defendant acted in a manner in which a reasonable person would act in protecting his or her own life or bodily safety." (Italics added; see CALJIC No. 5.12 (1994 rev.) Supp. Service pamp. (1996).)

Spencer does not contend that the self-defense instructions, as given, were an incorrect statement of the law. His argument is that the instructions should have been broadened to expressly include, as requested, prior assaults or threats made by Jefferson on third persons of which Spencer was aware.

■ Recently, in *People* v. *Humphrey* (1996) 13 Cal.4th 1073 [56 Cal.Rptr.2d 142, 921 P.2d 1], our Supreme Court held that evidence of battered women's syndrome may reduce a murder to justifiable homicide on the basis of reasonable self-defense. In reaching that conclusion, the court stated: "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself." (*Id.* at p. 1083.) In quoting from *People* v. *Smith* (1907) 151 Cal. 619, 628 [91 P. 511], the *Humphrey* court described this principle as well settled: "As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' [Citation.]" (*People* v. *Humphrey, supra*, at p. 1083.) ■ In *People* v. *Davis, supra*, 63 Cal.2d 648, the case relied on by the trial court to admit evidence of the victim's violence toward third persons, the court held that a defendant "was entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." (*Id.* at p. 656; see *People* v. *Minifie* (1996) 13 Cal.4th 1055, 1065 [56 Cal.Rptr.2d 133, 920 P.2d 1337], quoting from *People* v. *Davis, supra*; *People* v. *Pena* (1984) 151 Cal.App.3d 462 [198 Cal.Rptr. 819].)

Having ruled properly and correctly in admitting this evidence, we must conclude that the defense request for a special instruction expressly including prior assaults or threats by the victim to third persons of which defendant was aware should have been given. The Attorney General agrees with this conclusion. The denial of the request, however, was harmless.

There is nothing in the instruction given that required or suggested that the jury ignore or disregard the admitted evidence of Jefferson's acts or threats against third persons. (Cf. *People* v. *Humphrey, supra*, 13 Cal.4th at p. 1089.) On the contrary, the instruction informed the jury that "imminent danger is one that[,] from appearances[,] must be immediately dealt with. In determining whether a person presents an imminent danger, the defendant is entitled to consider *all the circumstances, including* any prior assaults or threats by that person against the defendant." (Italics added.) The phrase "all the circumstances" would include violent activity toward third persons, and the failure to expressly reference this evidence cannot reasonably be construed as a direction to the jury to exclude the evidence from its consideration. Indeed, the jury was specifically informed, through the instructions,

that it must decide all questions of fact based on the evidence admitted at trial. This evidence was admitted at trial and was before the jury for its consideration. Finally, when the evidence was received, the jury was specifically informed that it was being admitted for the purpose of showing the defendant's "state of mind" at the time of the shootings. The only "state of mind" that this evidence tended to establish was defendant Spencer's fear and apprehension of Jefferson. Thus, the precise point that Spencer sought to have conveyed to the jury through its special instruction was in fact conveyed through the trial court's repeated admonitions at the time the evidence was admitted.

Given this record, it simply cannot be said that the jury was somehow confused or misled concerning its consideration of this evidence.

In contrast to the situation here, the trial court in *People* v. *Humphrey, supra*, 13 Cal.4th 1073, affirmatively instructed the jury that ". . . 'evidence regarding Battered Women's Syndrome *may not be considered or used by you* in evaluating the objective reasonableness requirement for perfect self-defense' " (*id.* at p. 1081, italics added). The court concluded that the instruction was erroneous and then applied the *Watson* test of prejudice (see *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]), specifically rejecting application of the *Chapman* standard (see *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]): "We disagree that the *Chapman* standard applies. The erroneous instruction may have adversely *affected* the defense, but it did not deprive her of the right to present one or deny her equal protection. In effect, the court excluded some evidence as to one element of the defense. When the reviewing court applying state law finds an erroneous exclusion of defense evidence, the usual standard of review for state law error applies: the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant. [Citations.]" (*People* v. *Humphrey, supra*, at p. 1085, original italics.)

Because the error here is the same in nature but clearly less egregious than in *Humphrey*, the *Watson* standard applies and renders the error harmless.[3]

## III. Sentencing

### A. *Vulnerable Victim*

Spencer also claims two sentencing errors. First, he contends that the sentencing court erroneously relied on the vulnerability of the victims as

---

[3]Even if we were to apply the *Chapman* standard, we would conclude that the error was harmless beyond a reasonable doubt for the reasons stated.

a circumstance in aggravation when sentencing him to an upper term for voluntary manslaughter. He argues that by doing so, the court deprived him of his state and federal constitutional right to a jury trial. (See U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 16; Cal. Rules of Court, rule 421(a)(3).)

Spencer's claim of error is based on his predicate argument that the sentencing finding was inconsistent with the jury's verdict. At trial, the jury returned verdicts of manslaughter and attempted manslaughter. These verdicts are consistent with the implied finding that Spencer acted in imperfect self-defense—specifically, that he killed Jefferson and attempted to kill Brooks in the actual but unreasonable belief that he needed to defend himself against them. As the jury was instructed, a finding of actual but unreasonable belief in the need for self-defense is a defense to murder and attempted murder, but not to manslaughter or attempted manslaughter. (See *In re Christian S.* (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

The probation report and the prosecution's statement of circumstances in aggravation cited the vulnerability of the victims as a factor in aggravation, because Jefferson and Brooks were sitting in a car and taken by surprise. At sentencing, Spencer argued that such a finding was controverted by the verdict and statements from the jurors. He moved to strike the vulnerable victim circumstance in aggravation. The trial court did not do so, instead finding that the victims were particularly vulnerable because Jefferson had an open, unspilled beer between his legs and Brooks opened the car door and let Spencer into it. The court used this aggravating circumstance to justify imposition of the upper term for voluntary manslaughter.

Spencer contends, in essence, that the aggravating factor of victim vulnerability has no application in light of the jury's verdict that he acted in the good faith belief, albeit unreasonable, in the need to defend himself. In short, he contends that his good faith belief in the need to defend against the victims, as found by the jury, is inconsistent with the concept of victim vulnerability. The Attorney General responds that the jury could have reached its verdict based on a number of reasons and that to conclude the verdict represents a finding of imperfect self-defense is speculative. We would normally agree with the Attorney General's position concerning the interpretation of verdicts. However, it is the trial court's sentencing that we must review, and at the time of sentencing and for purposes of sentencing, the trial court believed that the verdict reflected a finding that Spencer acted in imperfect self-defense: "At this point the Court finds in the aggravating circumstance that we have particularly vulnerable victims outweighs the mitigating circumstances which have been shown in the case. [¶] I will also

note that the jury in itself performed a mitigating function in finding that the first degree murder charges were not established and finding based on imperfect self-defense that voluntarily [sic] manslaughter and attempted voluntarily [sic] manslaughter were the appropriate verdicts."

■ It has long been recognized that an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury negates the element of malice necessary to the crime of murder and makes the offense no greater than voluntary manslaughter. (*People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) The term "imminent" has been defined as "apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer." (CALJIC No. 5.17 (1995 rev.) (1996 Supp.).)

■ Victim "vulnerability" as an aggravating factor under rule 421(a)(3) of the California Rules of Court means "defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [156 Cal.Rptr. 502].) The obvious purpose of increasing punishment based on victim vulnerability is to deter criminal conduct that seeks to exploit the particularly vulnerable victim.

Here, the verdict as construed by the sentencing court, constituted a finding that the victims engaged in conduct that caused Spencer to honestly believe "in the necessity to defend against imminent peril to life or great bodily injury." (CALJIC No. 5.17.) Such conduct, in our view, is inconsistent with victim "vulnerability" as that term has been interpreted and inconsistent with the purpose of affording special protection from exploitation of this type of victim. Accordingly, victim vulnerability cannot serve as an aggravating factor for sentencing purposes.

The Attorney General also contends that since an aggravating factor may be established by only a preponderance of the evidence, the trial court was at liberty to disregard the jury's finding and make its own under this lesser standard of proof. Whether this view is correct (see *People* v. *Lewis* (1991) 229 Cal.App.3d 259 [280 Cal.Rptr. 128]) or incorrect (*People* v. *Takencareof* (1981) 119 Cal.App.3d 492 [174 Cal.Rptr. 112]) is an issue we need not resolve because there is nothing in the record to indicate that the trial court was exercising such an option.

Because the trial court not only relied on a single inapplicable aggravating factor but described the factor as outweighing all mitigating factors, the error cannot be considered harmless and the cause must be remanded for resentencing of the base term on the voluntary manslaughter count.

B. *Firearm Use\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. Conclusion

The upper term imposed on the voluntary manslaughter conviction is set aside and the cause remanded for resentencing of the base term on that count. In all other respects, the judgment is affirmed.

Poché, Acting P. J., and Hanlon, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 19, 1997.

---

*See footnote, *ante*, page 1208.