Filed 7/16/25  P. v. Olsen CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C099163 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF21-0256-401) |
| v. | |
| CARL ROYD OLSEN, | |
| Defendant and Appellant. | |

Defendant Carl Royd Olsen was convicted of voluntary manslaughter based on imperfect self-defense (Pen. Code, § 192, subd. (a)).[1]  After the jury found three aggravating circumstances to be true, the trial court sentenced him to 15 years in state prison, including the upper term of 11 years for the voluntary manslaughter conviction and an additional four years for an accompanying firearm enhancement (§ 12022.5).

_____

[1] Undesignated statutory references are to the Penal Code.

1

In this appeal, defendant seeks reversal of his voluntary manslaughter conviction, contending that the trial court erred in giving an initial aggressor instruction, which he argues was inapplicable and likely to mislead the jury into rejecting his claim of perfect self-defense. Defendant also challenges the trial court's reliance on two aggravating factors to impose the upper term on his manslaughter conviction. We affirm the judgment.

BACKGROUND

I.

Defendant and his brother, Eric Olsen (Olsen), lived together on rural property in Lincoln. During the period relevant to this appeal, several other individuals, including the victim, also lived on the Olsen brothers' property, either with them in the main house or elsewhere on the grounds. The victim, a longtime friend of Olsen's, was shot and killed on the property on Thanksgiving Day in 2021.

About ten months to one year before the shooting, Olsen and the victim had a physical altercation. Olsen confronted the victim about money Olsen believed he was owed and knocked the victim's hat off his head. The victim then hit Olsen several times, taking a "chunk" out of Olsen's upper lip. When defendant saw what the victim had done to Olsen, defendant stormed out of the main house and confronted the victim with a sword. Defendant pointed the sword at the victim and told him to leave the property. After initially retreating, the victim gave defendant "a very aggressive look" and lunged toward him. Defendant then hit the victim on the arm with the flat side of the sword blade. A friend of the victim saw him later with a cut on his jacket and arm, which the victim said came from blocking the sword. In a custodial interview played at trial, defendant said that he had hit the victim with the sword to teach him a lesson and "to put the fear of God into him."

Olsen's girlfriend, M.B., lived with him in the main house on the brothers' property. She earned money cleaning unwanted personal belongings out of clients'

residences. Early in the week of Thanksgiving 2021, M.B. was helping a client's family move. She asked Olsen for help, and Olsen brought the victim to assist as well. A few hours after arriving at the client's residence, the victim showed Olsen a gun he had found in a tote bin in the backyard. Olsen told the victim not to steal anything from the client and went with him to put the gun back.

On Thanksgiving morning, the client informed M.B. that the gun was missing. M.B. told Olsen, and Olsen, believing the victim had taken it, said he would "handle it." Olsen called defendant, who was house-sitting at a residence near their property. Olsen told defendant that the victim had stolen some items and asked defendant to come help him confront the victim about it. Defendant agreed.

Later that morning, M.B. told a tenant who lived in a trailer on the Olsen brothers' property to come up to the main house because the victim "was going to be confronted" and "was finally going to be kicked off the property." The tenant was happy to hear this because, about three weeks earlier, she and the victim had gotten into an argument when she told him he could no longer stay in her trailer. The victim kicked the tenant in the shin four times with his steel-toed boots, leaving soft tissue damage and a dent in her shin. The tenant told others, including defendant, about the incident. The tenant went up to the house to watch the confrontation, believing the victim "might get beat up."

When the tenant entered the house, Olsen, M.B., and two others were in the kitchen. The victim was outside in the bed of a truck, about 20 to 30 yards from the house, unloading things from one of M.B.'s recent hauls. Everyone inside was talking about what was going to happen. M.B. told the tenant that the victim had stolen a gun from a client's house, that this was "the last straw," and that "they" were going to go ask the victim about it.

When defendant arrived at the house, Olsen told him more about what the victim was believed to have done. According to defendant, it was not until he arrived at the house that he learned it was a gun and ammunition that the victim had stolen. The

3

brothers discussed the situation for two or three minutes, calmly and quietly.  Both brothers testified that they did not make a detailed plan; Olsen just stated that they should " 'go out and confront [the victim] about stealing the gun.' "

Defendant went to his room and retrieved and loaded a revolver.  Defendant testified that he armed himself because he was a bit scared, knowing the victim was "prone to violent acts and unstableness."  Olsen grabbed a steel club, described by others as a "billy club," that was about one and a half feet long.  The brothers went out to confront the victim about the missing gun.  Defendant concealed his revolver in his back pocket.  Olsen did not see defendant carrying anything.

Olsen called out to the victim, who responded briefly but kept working in the truck bed.  According to the tenant, who was watching from the house, the brothers walked up to the truck and stopped "a couple feet away."  Olsen started yelling at the victim, who was standing above them on the truck's tailgate.  Defendant said nothing.  The victim had his back toward the brothers, facing the cab of the truck, as he continued pulling things out of the truck bed.  Olsen asked the victim several times, " 'Where's the gun, motherfucker?' " or " 'What did you do with the fucking gun?' "  When the victim did not answer, Olsen "slapped," "smacked," or "hit" him in the back of the leg with the club two times to get his attention.  On the stand at trial, Olsen reenacted the motion, with his hand starting by his right ear and then extending out in front of him.  As M.B. recalled, Olsen gave the victim "a whack" with the club but not hard enough to knock him over.  Defendant described the contact as "not very hard."  Olsen recounted that the victim stopped pulling things out of the truck and said, without moving, " 'What are you talking about?' "  Olsen responded, " 'The gun you stole.  Where's the fricking gun?' "  M.B. heard Olsen say, " 'The gun.  The gun, motherfucker, the gun.' "

As described by Olsen, the victim then started to turn toward the brothers "real quick," looking "mad."  According to defendant, the victim turned from the waist up and gave him the same look he had given during the sword incident.  Defendant said that the

4

victim's "hand went down to where I couldn't see it anymore[,] and his body turned around, [and] his shoulder started coming up." Olsen, who could not see the victim's hands as he turned, backed up slightly to put more distance between them. Defendant testified that he thought the victim was reaching for a gun. Fearing for his and his brother's safety, defendant drew his gun and shot the victim in the head. The victim fell out of the back of the truck onto the ground. Olsen turned to defendant and said "something like, 'What the hell did you do that for?' or 'You weren't supposed to do that.' " Defendant looked down and said, " 'Well, he's dead.' "

From inside the house, the tenant saw the victim turn and start to respond to Olsen by saying part of the word "what" before defendant shot him. The gun fired at the same time as the victim turned. The tenant did not think the victim had anything in his hand, because he had just put down a chair when he turned to speak to the brothers. From her vantage point behind an SUV near the front walkway, M.B. saw defendant standing to the left of the tailgate, while Olsen was to the right of it. She observed the victim turn to his left toward defendant, and then she heard a gunshot and saw defendant holding his gun in the air as the victim fell to the ground.

When defendant checked the victim's body, he did not find a gun. This made him "[t]errified," thinking that authorities would never believe his explanation of what had happened. The tenant testified that defendant looked "bewildered" and as if he did not know what he had done; he appeared excited but not in a happy way.

Defendant walked away from the truck and fired the remaining bullets from his revolver into the ground. He then dragged the victim's body across the driveway and covered it with a bathtub. Later that night, defendant loaded the victim's body into his truck and drove to a secluded location, where he pushed it down an embankment.

The next day, the body was found, and authorities were alerted. The investigation connected the victim to the Olsen brothers' property, and eventually defendant and Olsen

5

were taken into custody. After the brothers' arrest, M.B. found the stolen gun in a van on the property where the victim kept his belongings.

In a jail call from Olsen to M.B., which was played at trial, Olsen said, "What was discussed in the house and what happened were two entirely different things." In a separate jail call from Olsen to the tenant, also played at trial, Olsen said that defendant "wasn't supposed to do that, and . . . the only reason he was supposed to have that fucking gun is because we thought [the victim] had one."

In an amended information filed in May 2023, the People charged defendant with first degree murder (§ 187, subd. (a)) with an accompanying enhancement for personal and intentional discharge of a firearm in the commission of a felony (§ 12022.53, subd. (d)). The People also alleged six aggravating factors under California Rules of Court, rule 4.421. The amended information charged Olsen with accessory after the fact (§ 32) and assault with a deadly weapon based on his use of the billy club (§ 245, subd. (a)(1)). Shortly before trial, Olsen pleaded to the charges against him.

## II.

At defendant's trial, the trial court instructed the jury on general principles of homicide as well as first and second degree murder. Over the People's objection, the court also instructed the jury on self-defense and defense of others (CALCRIM No. 505) and on voluntary manslaughter based on imperfect self-defense or imperfect defense of another (CALCRIM No. 571).

At the People's request, the trial court also gave CALCRIM No. 3472 and a modified version of CALCRIM No. 3471, both of which limit the applicability of the self-defense doctrine. CALCRIM No. 3472 removes the right to self-defense from one who "provokes a fight or quarrel with the intent to create an excuse to use force." The court's version of CALCRIM No. 3471, entitled "Right to Self-Defense: Initial Aggressor" and modified to remove inapplicable references to "mutual combat," said: "A person who starts a fight has a right to self-defense only if: [¶] 1. He actually and in

6

good faith tries to stop fighting; [¶] AND [¶] 2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting. [¶] If a person meets these requirements, he then had a right to self-defense if the opponent continued to fight."

Defense counsel objected to both CALCRIM Nos. 3471 and 3472, arguing that there was no evidence that defendant and the victim "were actually engaged in a fight," and that those instructions only applied when there was "a fight in progress." The trial court overruled the objection, finding it "absolutely appropriate" to give the two instructions because "the jury needs to know that there[ are] some limitations on the use of self-defense."

In closing arguments, the prosecution presented its theory that defendant had shot the victim deliberately and with premeditation, out of "vengeance" because defendant was "fed up" with the victim's behavior on the property. The prosecutor asked the jury to convict defendant of first degree murder, not the lesser included offense of voluntary manslaughter. Defense counsel argued that defendant was acting in some form of self-defense. He urged that no evidence supported first or second degree murder but acknowledged that "reasonable minds can disagree and it's possible that you can fall on voluntary manslaughter" because defendant had acted in imperfect self-defense or imperfect defense of another.

The jury convicted defendant of voluntary manslaughter based on imperfect self-defense (§ 192, subd. (a)). It acquitted him of first and second degree murder. The jury also found true a personal firearm use enhancement under section 12022.5, in place of the original section 12022.53 allegation.

### III.

The trial court then proceeded with a bifurcated jury trial on the six alleged aggravating factors: that the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or

7

callousness (Cal. Rules of Court, rule 4.421(a)(1)); that defendant was armed with or used a weapon in committing the crime (rule 4.421(a)(2)); that the victim was particularly vulnerable (rule 4.421(a)(3)); that defendant induced others to participate in the crime or occupied a position of leadership or dominance (rule 4.421(a)(4)); that the crime involved planning, sophistication, or professionalism (rule 4.421(a)(8)); and that defendant took advantage of a position of trust or confidence to commit the crime (rule 4.421(a)(11)).[2] The parties presented no additional evidence at this phase of trial.

After deliberating for about one and a half hours, the jury reached a verdict on the aggravating factors. The jury found true the first three alleged aggravating factors under rule 4.421(a)(1)-(3) and found the remaining three not true.

The following month, after receiving the probation report and both parties' sentencing briefs, the trial court held a sentencing hearing. In his sentencing brief, defendant sought a lower term sentence for his manslaughter conviction and argued that reliance on the rule 4.421(a)(1) and (2) aggravating factors would constitute "impermissible dual use" of facts for an upper term. The probation report and the prosecution recommended an 11-year upper term sentence for the manslaughter offense. The prosecution urged the trial court to rely only on the rule 4.421(a)(1) and (3) aggravating factors, specifically the "cruel, vicious, or callous" portion of rule 4.421(a)(1), noting that the court could not rely on the rule 4.421(a)(2) weapon use factor because it encompassed an element of the firearm use enhancement. The parties maintained these positions at the sentencing hearing.

Before pronouncing sentence, the trial court acknowledged that it could not aggravate the manslaughter sentence based on the rule 4.421(a)(2) weapon use factor. Addressing the victim's family, the court described this as "a tragic case" that could have

---

[2] Undesignated rule references are to the California Rules of Court.

been avoided if defendant had not tried to take the law into his own hands. The court then said: "Every religion known to the Court prescribes the treatment of corpses. What [defendant] did in this case was grotesque. [¶] The factors in aggravation found by the jury not dealing with the fact that Defendant is armed are sufficient to impose the upper term on the manslaughter charge. The Court does so." The court declined to impose the upper term on the firearm use enhancement, reasoning that defendant lacked a criminal record and that the victim was "not wholly blameless." It sentenced defendant to an aggregate term of 15 years in state prison, consisting of the upper term of 11 years for the voluntary manslaughter conviction and the middle term of four years for the firearm use enhancement, to run consecutively.

Defendant timely appealed.

## DISCUSSION

### I.

Defendant first contends that the trial court erred by instructing the jury with CALCRIM No. 3471, which he argues was inapplicable to the facts of his case and was likely to confuse and mislead the jury into rejecting his claim of perfect self-defense.

A trial court must instruct the jury on all "general principles of law that are ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case." ' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) It is error, however, to give an instruction that correctly states the law but is not supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) In this context, substantial evidence is "evidence sufficient to deserve jury consideration." (*Marshall*, at p. 39; *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

"Murder is the unlawful killing of a human being with malice aforethought." (*People v. Thomas* (2023) 14 Cal.5th 327, 385, citing § 187, subd. (a).) "A killing in perfect self-defense is justifiable homicide," not a crime. (*Thomas*, at pp. 385-386.)

9

"Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' " (*Id.* at p. 386.) "Imperfect self-defense, on the other hand, 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.' [Citation.] Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice." (*Ibid.*) We review a claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Defendant does not dispute that the jury was instructed correctly on these general principles of self-defense. His contention on appeal is that the trial court erred in giving a modified version of the initial aggressor instruction in CALCRIM No. 3471 because, he maintains, there was no evidence that he started a fight within the meaning of that instruction. He argues that giving this instruction, which the prosecutor highlighted in closing arguments, violated his federal constitutional rights by lowering the prosecution's burden to disprove his claim of perfect self-defense. We disagree.

Initially, we conclude that defendant's claim of instructional error is sufficiently preserved for our review. At trial, defense counsel objected to CALCRIM No. 3471 at least in part on the ground that there was no evidence that defendant and the victim actually fought. And the People do not assert forfeiture of this claim. Accordingly, we need not reach defendant's alternative argument that, to the extent further objection was required, he received ineffective assistance of counsel.

The " ' "ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." ' " (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) CALCRIM No. 3471 describes the steps that must be taken before an "[i]nitial [a]ggressor" may reclaim the

10

right to self-defense. (See § 197, subd. (3).) It requires a person who "starts a fight" to "tr[y] to stop fighting" and to communicate that desire before regaining the right to claim self-defense "if the opponent continue[s] to fight." (CALCRIM No. 3471.) This instruction embodies the common law initial aggressor doctrine, which applies when a defendant has made "a felonious assault upon another, or has created appearances justifying that other in making a deadly counter attack in self-defense." (*People v. Hecker* (1895) 109 Cal. 451, 463, abrogated on other grounds by statute as stated in *People v. Hardin* (2000) 85 Cal.App.4th 625, 633-634.) The doctrine does not apply where the initial act of aggression, though wrongful, "is not felonious" (such as a simple assault) and is countered by use of deadly force. (*Hecker*, at p. 464.)

We conclude that it was proper for the trial court in this case to give the modified version of CALCRIM No. 3471 because there was substantial evidence that defendant was an initial aggressor. There is no dispute that defendant and Olsen instigated the confrontation with the victim. They walked up to him, both armed with weapons (albeit while defendant's was concealed), while the victim was unloading a truck. Olsen verbally accosted the victim by yelling questions laced with profanities at him and then struck him with a metal club. That act constituted a felonious assault with a deadly weapon (§ 245, subd. (a)(1)), for which Olsen ultimately accepted criminal liability, as the jury in defendant's case was informed. While defendant himself did not yell at or hit the victim, there was substantial evidence that he fully participated in initiating the aggression. Evidence at trial showed that defendant drove to the house for the specific purpose of helping his brother "confront" the victim. Defendant retrieved and loaded a revolver after agreeing to "confront" the victim. With his brother, defendant approached the victim and stood feet away from him as his brother struck the victim twice with a club. And about a year before the shooting, defendant himself had confronted the victim with a sword, hitting him hard enough with the blade to cut the victim's jacket and arm. Viewed as a whole, this was evidence sufficient to deserve the jury's consideration of

11

whether defendant was an initial aggressor and thus sufficient to support the trial court's use of CALCRIM No. 3471 in this case.  (See *People v. Marshall*, *supra*, 15 Cal.4th at pp. 39-40.)

## II.

Defendant next asserts three distinct violations of his Sixth Amendment right to a jury trial arising from the trial court's reliance on certain aggravating factors to impose an upper term sentence for his manslaughter conviction.  Although the People mount various forfeiture arguments in response, claims asserting the denial of the constitutional right to a jury trial are not forfeited by a failure to object below.  (*People v. French* (2008) 43 Cal.4th 36, 47 [requiring express waiver of constitutional jury trial rights].)  Thus, we address each contention on its merits and do not reach defendant's alternative argument that his counsel's failure to object amounted to the ineffective assistance of counsel.  To the extent that defendant maintains that the claimed errors also violated section 1170, subdivision (b), those claims are forfeited.  (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [claims of error generally may not be raised for the first time on appeal].)  Nevertheless, because that provision "effectively codifies" the relevant Sixth Amendment principles (*People v. Lynch* (2024) 16 Cal.5th 730, 757 (*Lynch*)) and because defendant's statutory claim is essentially coextensive with his constitutional one, our resolution of his Sixth Amendment arguments, in effect, resolves his section 1170 claims as well.

## A.

Under the Sixth Amendment, " '[v]irtually "any fact" ' that increases 'a defendant's exposure to punishment . . . must "be submitted to a jury" and found unanimously and beyond a reasonable doubt.' " (*Lynch*, *supra*, 16 Cal.5th at pp. 761-762; *Cunningham v. California* (2007) 549 U.S. 270, 281 ["any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt"].)  Consistent with this requirement, under section 1170, subdivision (b), as amended before defendant's bifurcated trial and

12

sentencing in this case, a trial court may "impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2); Stats. 2022, ch. 744, § 1.)

B.

Defendant contends that the trial court violated the Sixth Amendment by relying in part on one portion of the aggravating factor set forth in rule 4.421(a)(1), where no evidence establishes that the jury necessarily found true that defendant's conduct satisfied that same portion of the rule.

The trial court in this case gave a modified version of CALCRIM No. 3224 stating, in relevant part, that, for the aggravating factor in rule 4.421(a)(1) to be found true, the People had to prove that "[d]uring the commission of the crime, the defendant used great violence, inflicted great bodily harm, or committed other acts showing a high degree of cruelty, viciousness, or callousness." (Although defendant notes the instruction's omission of the "threat of great bodily harm" portion of rule 4.421(a)(1), his claim does not turn on this discrepancy.) The relevant verdict form asked the jury to find true or not true "that the crime alleged involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness."

Defendant argues that the trial court imposed the upper term on his manslaughter conviction because it found that he committed acts showing a high degree of cruelty, viciousness, or callousness; but, because of the compound, disjunctive phrasing used in rule 4.421(a)(1), in the CALCRIM No. 3224 instruction, and in the verdict form, he maintains that it is unclear whether the jury found true beyond a reasonable doubt the " 'cruelty, viciousness or callousness' option," as opposed to one of the other "options"

13

or types of conduct set forth in the rule. According to defendant, the inability to determine whether the jury found true "the callousness aggravating factor" purportedly relied upon by the trial court to impose the upper term means that he was deprived of his Sixth Amendment right to a jury trial on that factor.

This argument falters at the outset because the record does not support defendant's characterization that the trial court rested only on the cruelty, viciousness, or callousness portion of rule 4.421(a)(1). While the court did emphasize that defendant's treatment of the victim's corpse was "grotesque," it specifically found that "[t]he factors in aggravation found by the jury not dealing with the fact that Defendant [was] armed are sufficient to impose the upper term on the manslaughter charge." This statement demonstrates that the court relied on the rule 4.421(a)(1) and (3) aggravating factors overall—not just a single clause in one of the factors—when it selected the upper term.

As defendant observes, that means we cannot tell whether the trial court may have relied in part on the fact that defendant inflicted "great bodily harm," which would violate the state law proscription against the dual use of a fact that is an element of the crime being punished. (Rule 4.420(h).) But in the absence of contrary evidence, we presume the trial court followed the law. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.) And it does not follow that, having ignored the "great bodily harm" clause, the trial court necessarily relied on the "cruelty, viciousness, or callousness" portion of rule 4.421(a)(1) that defendant challenges. The court might also have rested on the "great violence" part of the rule, as to which defendant makes no argument. (Rule 4.421(a)(1).) And in any event, even if the trial court did make improper dual use of facts, defendant does not seek reversal of his sentence on that basis.

To the extent that defendant contends that the jury was constitutionally required to specify—perhaps through use of a special verdict form—which portion of rule 4.421(a)(1) it found true, he fails to develop that argument beyond a conclusory assertion of a Sixth Amendment violation. We therefore decline to consider it.

14

(*People v. Stanley* (1995) 10 Cal.4th 764, 793 [absence of cogent legal argument results in forfeiture]; cf. *Lynch*, *supra*, 16 Cal.5th at p. 770 [declining to examine "the practical differences, if any, between the jury's factfinding role and the description of aggravating circumstances that appears in the rules of court" or any "distinction between aggravating circumstances considered by the trial court and the facts the jury must find true beyond a reasonable doubt"].)

C.

Defendant also asserts a Sixth Amendment challenge to the trial court's reliance on the jury's true finding for the rule 4.421(a)(3) aggravating factor that the "victim was particularly vulnerable." Defendant contends that his conviction for voluntary manslaughter based on imperfect self-defense "necessarily negates" victim vulnerability. And he argues that, under the Sixth Amendment, a trial court "may not rely on an aggravating factor the underlying facts of which are inconsistent with the jury's findings on a defendant's predicate offense." We find no merit in this claim.

Defendant's argument principally relies on *People v. Spencer* (1996) 51 Cal.App.4th 1208. In *Spencer*, the Court of Appeal held that the trial court's finding of victim vulnerability as an aggravating factor under former rule 421(a)(3) was improper because that finding was inconsistent with the jury's implied finding from its manslaughter verdict that the defendant acted in imperfect self-defense. (*Spencer*, at pp. 1222-1223.) The court reasoned that the jury's verdict "constituted a finding that the victims engaged in conduct that caused Spencer to honestly believe 'in the necessity to defend against imminent peril to life or great bodily injury.' " (*Id.* at p. 1223.) And such conduct by the victims was "inconsistent with victim 'vulnerability.' " (*Ibid.*)

*Spencer* is inapposite. In *Spencer*, *the trial court* found true the vulnerable victim aggravating factor. (*People v. Spencer*, *supra*, 51 Cal.App.4th at p. 1222.) In this case, *the jury* found that factor true beyond a reasonable doubt. Accordingly, there was no

15

constitutional barrier to the trial court relying on that factor in this case. (See *Lynch*, *supra*, 16 Cal.5th at pp. 761-762; *Cunningham v. California*, *supra*, 549 U.S. at p. 281.)

In any event, we also see no contradiction between the jury's manslaughter verdict and its finding that the victim was particularly vulnerable. Vulnerability, for purposes of rule 4.421(a)(3), " ' "means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154 [discussing former rule 421(a)(3)]; see CALCRIM No. 3226.) Imperfect self-defense " 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.' " (*People v. Thomas*, *supra*, 14 Cal.5th at p. 386.) The jury's finding that defendant genuinely believed that he was in imminent danger does not preclude the possibility that the victim could be seen, objectively, as particularly unguarded and accessible to defendant. The former does not necessarily negate the latter.

### D.

For his final Sixth Amendment claim, defendant argues that he was deprived of a jury trial on all elements of the rule 4.421(a)(1) and (3) aggravating factors because the trial court failed to instruct the jury on what he calls an "essential element" of both aggravating factors: that defendant's conduct was distinctively worse than the ordinary commission of the crime.

With respect to the aggravating factor under rule 4.421(a)(1), the jury was instructed, in conformity with CALCRIM No. 3224, that the People had to prove both that: (1) "the defendant used great violence, inflicted great bodily harm, or committed other acts showing a high degree of cruelty, viciousness, or callousness" (as discussed above); and (2) "[t]he type of violence, bodily harm, or cruelty, viciousness, or callousness was distinctively worse than what was necessary to commit the crime." Aside from omitting references to "threat of great bodily harm" as discussed above, the rest of the trial court's instruction on this factor replicated the language of the pattern

16

CALCRIM No. 3224 instruction, except that it omitted the sentence: "You may not find the allegation true unless all of you agree that the People have proved that the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime." (CALCRIM No. 3224.) The trial court's instruction for rule 4.421(a)(3) likewise substantially mirrored the pattern CALCRIM No. 3226 instruction, save for omitting the same sentence also contained in CALCRIM No. 3226.

This omitted sentence derives from the concept that "[t]he essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People v. Moreno* (1982) 128 Cal.App.3d 103, 110.) Courts have phrased this principle in various ways, asking "whether the manner of the crime's commission was distinctively worse 'when compared to other ways in which such a crime could be committed' " (*Chavez Zepeda v. Superior Court* (2023) 97 Cal.App.5th 65, 89) or whether a given fact made a defendant's conduct " 'distinctively worse than it would otherwise have been' " (*People v. Lincoln* (2007) 157 Cal.App.4th 196, 204). Defendant argues that both instructions' omission of the requirement that the jury find his conduct "distinctively worse than an ordinary commission of" the crime unconstitutionally relieved the jury of performing the comparative analysis required by the "distinctively worse" phrase, which he views as an essential element of the aggravating factors. (CALCRIM Nos. 3224, 3226.)

Even assuming for argument's sake that defendant is correct in viewing the "distinctively worse" concept as an independent "element" of the aggravating factors that must be found true by a jury in order to comply with the Sixth Amendment, the given instructions adequately conveyed that requirement. As defendant acknowledges, the jury was instructed that, to find true the rule 4.421(a)(1) aggravating factor, it had to find that "[t]he type of violence, bodily harm, or cruelty, viciousness, or callousness was distinctively worse than what was necessary to commit the crime." This language adequately instructed the jury that it had to find defendant's crime to be worse than

17

ordinary. Indeed, notwithstanding the various phrasings of the principle over the years, courts have alternately phrased the "distinctively worse" principle in much the same way that the instruction did here. (See, e.g., *Chavez Zepeda v. Superior Court*, *supra*, 97 Cal.App.5th at p. 91 [referring to "wrongfulness beyond that inherent in the commission of the offense"].) Thus, we agree with the People that, even without the sentence from the pattern instruction, the trial court's instruction adequately communicated to the jury that an ordinary voluntary manslaughter would not suffice.

We reach the same conclusion with respect to the instruction given for the rule 4.421(a)(3) aggravating factor. Defendant's jury was instructed that the People had to prove that the victim was "particularly vulnerable," defined to "include[] being defenseless, unguarded, unprotected, or otherwise susceptible to the defendant's criminal act to a special or unusual degree." (See CALCRIM No. 3226.) This language—which tasked the jury with deciding whether the victim was vulnerable "to a special or unusual degree"—adequately conveyed that the jury had to find the victim distinctly more vulnerable than an ordinary victim, making defendant's conduct distinctively worse than ordinary. (See *People v. DeHoyos*, *supra*, 57 Cal.4th at p. 154 [for this factor, " ' "[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases" ' " and " ' "[v]ulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act" ' "].) We therefore reject defendant's claim.

18

## DISPOSITION

The judgment is affirmed.

/s/
FEINBERG, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
MAURO, J.